1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

JOSEPH AMATO, et al.,individually          CIVIL ACTION NUMBER:
and on behalf of all others similarly      18-16118
situated

          Plaintiffs                              (KMW)

     v.                                    MOTION FOR
                                           CLASS CERTIFICATION

SUBARU OF AMERICA, INC. and
SUBARU CORPORATION

          Defendants.
_____
RICARDO AQUINO, et al., individually       CIVIL ACTION NUMBER:
and on behalf of all others similarly      22-990
situated,

          Plaintiffs,                             (KMW)


     v.
SUBARU OF AMERICA, INC. and
SUBARU CORPORATION,


          Defendants.

_____

MITCHELL H. COHEN Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101
Friday, November 21, 2025
Commencing at 11:00 a.m.


B E F O R E:   THE HONORABLE KAREN M. WILLIAMS,
               UNITED STATES DISTRICT JUDGE

       Sherri Benson, Official Court Reporter
             sherri_benson@njd.uscourts.gov
                    856-576-7014
  Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.

               United States District Court
                  District of New Jersey

**A P P E A R A N C E S:**

KRANTROWITZ GOLDHAMER & GRAIFMAN, P.C.
BY: GARY GRAIFMAN, ESQUIRE
135 CHESTNUT RIDGE ROAD
SUITE 200
MONTVALE, NEW JERSEY 07645
For the Plaintiffs

BALLARD SPAHR
BY:  NEAL WALTERS, ESQUIRE
BY:  CASEY WATKINS, ESQUIRE
700 EAST GATE DRIVE - SUITE 330
MOUNT LAUREL,  NEW JERSEY 08054
For the Defendants

United States District Court
District of New Jersey

(PROCEEDINGS held in open court before The Honorable Karen M. Williams, United States District Judge, at 11:00 a.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Good morning.  Everyone please be seated. We're here this morning in the matter Amato and Aquino versus Subaru America, Inc. and Subaru Corporation.  Civil Action Numbers 18-16118 and 22-990.  I do believe these cases have been consolidated under 18-16118.

May I have appearances of Counsel, please.

MR. GRAIFMAN:  Good morning, Your Honor.  Gary Graifman from Kantrowitz, Goldhamer & Graifman for plaintiffs.

THE COURT:  Thank you.

MR. WALTERS:  Good morning, Your Honor.  For the Subaru defendants from The Law Firm of Ballard Spahr, Neal Walters and Casey Watkins.

THE COURT:  Let me start by saying, I have personally dedicated tons of time to these motions.  Because, as you all know, Judge Rodriguez was originally assigned to this case or to the consolidated cases.  Over the summer, I had previewed the cases to see whether I could get them done sooner than he could.  And I guess you all know the answer to that was no.

So I then turned my attention back to the motion to certify class, began writing, as you all know because you've read these motions to certify class, in order to be done well in writing, they are a lot of pages.  So efforts were made to

United States District Court
District of New Jersey

get a written product filed, and I decided to rely or revert to Rule 1, which as most of you should know, stands for efficiency.  The notion the Court and the parties should proceed to efficiently address issues pending before the Court.

So that's why I decided to have everyone in.  We had a few scheduling snafus, and I ended up rescheduling this until today so everybody could be here and still enjoy Thanksgiving.

So we're here on the motion to certify class.  I am very clear about what the appropriate course of action is, or to be stated more succinctly, my decision with respect to the motion to certify class is clear to me what it should be.

I have you all here to see if there's anything you want to add to the motions, particularly in light of the defendants' positions with respect to the motions for summary judgment that were pending, and the desire to have those heard prior to the motion to certify class, rendering the motion to certify class, I'll call it moot.

So there were a lot of things happening with this case, that I thought, again, Rule 1 -- efficiency.  Let's get to it and get the case moving forward, especially since one of the cases is a 2018 case, and here we are in 2025, about to be 2026.  So let's get cracking.

Mr. Graifman, your motion.

MR. GRAIFMAN:  Thank you, Judge.  So this case at its core and with respect to the class certification motion is

United States District Court
District of New Jersey

based on defendants' material omission or omissions. Defendants aggressively and relentlessly marketed these vehicles as racing, rally vehicles, the pinnacle of Subaru engineering.  One of their representatives called it a halo vehicle.  And when asked what that mean, he said it's the pinnacle of Subaru engineering.

They tuned the motors, the ECU aspect of the motors to be very aggressive to get every bit of horsepower out of those engines.

All of that was marketed as aggressive racing history for WRX.  That stands for World Rally Cross racing, something to that effect.

There was only one problem, there was a severe mismatch between the aggressive tuning of these vehicles and the high, powerful engines and the very weak pistons, in particular the piston ringlands that hold these pistons together.

In this case the pistons themselves were made of a composite metal called sintered metal, rather than forged metal, which made it weaker.  The ringlands themselves were not cooled.  There's a mechanism to cool the pistons which are oil sprayers, which these vehicles didn't have.

Basically the defect here is a common defect.  It's a weak ringland, piston ringlands.  If that ringland breaks down, the entire engine goes and you have to rebuild the engine, or

United States District Court
District of New Jersey

at least parts of the engine.  It's called a partial engine block.

So what we have here is what we contend, and we say the evidence demonstrates, is a clear defect that is material and would be material to a purchaser of this vehicle, particularly because of the fact that they market it as a, again, the pinnacle of their engineering, highly tuned, very aggressive, powerful engine with a weak piston, which is its Achilles heel, that they don't tell the purchasers about.

So in this case, we intend to prove that it is a defect.  And we contend that the liability issues in this case are all common issues.  What are those issues?  That the class engine piston ringlands have a defect which we think we are very confident we can prove because the defendants' own witnesses have admitted it --

THE COURT:  Can you slow down a tad?

MR. GRAIFMAN:  Certainly, Judge.  The second issue is that the defendants knew about the piston ringlands issue, and that again is common evidence that we would demonstrate to a jury.

The third issue is whether the information would be material to a consumer who is thinking of purchasing one of these vehicles.  And that is something that is -- materiality is based on an objective, reasonable consumer standard because what we're dealing with here are three consumer fraud statutes

which all indicate or require that the materiality issue be deemed to be material to the reasonable consumer.  It's an objective standard.  New York (GBL)349 says that it's the ordinary consumer standard that it would be demonstrated to.

So, the liability issue we think is -- or we will present common evidence to demonstrate that.

The next issue would be defendants' knowledge of the defect.  That we can also prove through common evidence.  And, in fact, if one goes back and looks at Judge Rodriguez's original decision in Amato in 2019, he lists all of those items that we alleged at the time would be demonstrated, and he found that those demonstrate that we have alleged knowledge.  So that was the pleading.

Now we're at the proof stage, and we do have the proof that we allege in the complaint.  What is that proof?  The proof is, first of all, there were NHTSA or National Highway Traffic Safety Administration complaints early on, 2009 and 2010, demonstrating that there's a defect.

There's consumer complaints to Subaru, showing that they knew about it.  And under the TREAD Act, which is a Federal Act, if they, as a manufacturer and a seller, know of a defect that could implicate safety issues, they are required to report it.  So they monitor these complaints.  They're not just out there in the atmosphere.  They have to know these complaints in order to comply with the TREAD Act.

The third thing is internal documents that they were attempting to fix this problem.  How were they attempting to fix it?  We have evidence that they had design drawings that show how they were trying to make the ringlands thicker on these class vehicles so that they would be stronger.

In fact, in 2019 model, which is the model year after the last class vehicle year, they did make them stronger, and that's when they announced that they were making -- they were improving the vehicles by making the pistons stronger and by retuning the ECU.  So they knew about the problem.

The other thing is that they had internal documents where they were trying to figure out what to do.  One of the documents we have, for example, Exhibit-8, is an email from one of the administrators who said, "Can you please do me a favor?  We are trying to justify improving the design of the STi engine.  Can you tell me how many broken piston claims there were for each of the model years of the cars."  And he goes through the STis and the WRX models.

And the answer from his assistant is, "I can pull claims with piston fail codes, but most of these failures would be a short block replacement.  In those cases, I wouldn't be able to determine which short blocks were due to broken pistons.  I think we can come up with a number, if that's what you're looking for."

So they knew there was a problem and they were trying

United States District Court
District of New Jersey

to figure out how to fix the problem.  So knowledge in this case is going to be a common issue, which is based on the defendants' knowledge, that's clear.

With regard to materiality, as I mentioned, in each of these jurisdictions, materiality is the objective reasonable consumer standard, so a jury would have to just determine if a reasonable consumer would have found this to be material, this omission.  So materiality is another issue.

With regard to reliance, we don't allege reliance, obviously, because it's an omission, but defendants have raised it.  Reliance is not an issue for a number of reasons.  First of all in New York, under the New York (GBL) 349, the law is very clear, reliance is not an issue.  It's not Part 1 of the elements of the claim in New York.  There's plenty of case law on that that we cite to.

One is a Second Circuit case, *Eidelman v. Sun Products*, 2022 Westlaw 1929250, (Second Circuit June 6th, 2022).  And it cites in there New York cases that support that.

With regard to Arizona, under the Arizona Consumer Fraud Act, reliance is presumed if it's an omission, and it is a material omission that a consumer would rely on.  And the cases that support that that we cite to are the *In Re: Theranos*, which was the fake blood case, an analysis case where the Court said that the standard is, if it's an omission claim, would -- a claim as stated under the Arizona Consumer Fraud Act

if it's a material and the consumer would not have purchased the product had they known of the misrepresentation.

And the same thing is true with the Indiana case, a Consumer Fraud Act. So we have no issue with reliance.

The other issue that I think the defendants raised was that they claim it's a low manifestation rate of 0.76. That is not an issue that is dispositive in this case. Because first of all, they're talking about the in-warranty repairs that people brought their vehicles in during the warranty, and the case is primarily about those vehicles that are outside of the warranty. If they were covered under the warranty, obviously, we wouldn't be here. But the cases of failure that are post-warranty is something they don't keep track of.

In addition to that, we have Seven Muhammad who owns a shop who specializes in WRX and WRX STi vehicles, that's what he repairs. And he said he sees hundreds of these a year, that was his testimony.

And by the way, that testimony, we didn't depose him. Defendants subpoenaed him. They questioned him. They asked him his opinion as to what he thought was the problem, and he told them that it was the ringland gaps, in his opinion. They questioned him as to how many he sees a year, and he told them hundreds. So he was really, in a sense, their witness in that setting.

Their 30(b)(6) witness, John Gray, testified that he

United States District Court
District of New Jersey

can't enumerate how many vehicles after the warranty are repaired because he realizes many people go to independent shops, and he can't tell you.

So the manifestation rate is not an issue. But it's not an issue for another very important reason. We're asking for damages in this case based on two theories. One theory is what we call the diminution of value or the price premium theory. And under the price premium theory, when somebody goes to buy the car, they are paying a premium for this high pinnacle of engineering, halo, muscle-engined car. And had they known of the defect, they would have paid less.

Now we have an expert, Dr. Sharp, who did an analysis under hedonic regression analysis, which he describes in his opinion, and which has been approved where he has done it, in fact, in a case called *Hamm v. Mercedes Benz*, which we cite in our brief. And another case called *Aberin v. Honda*, he's used it, and it's been approved as a hedonic regression method to demonstrate diminution of value at the point of purchase.

So if we're talking about an overpayment, it doesn't matter what happens after the fact, if there's a high rate or they don't keep track of the rate, as it turns out. What matters is that the person at the point of purchase is overpaying for the vehicle, and that's a class-wide damage, we allege.

He has even been able to, through this methodology,

United States District Court
District of New Jersey

formulate that the amount per person would be approximately $2,000. I think he said $2,094 per vehicle is the overpayment based on the hedonic regressions analysis. So with regard to the damages, there's a common methodology to demonstrate the damages.

The other method of damages that we allege and we have in our motion and he has opined on is the cost of repair. In other words, everybody obviously who has had the problem is going to pay for the repair and how much did those people pay.

Now, in that setting, there's two ways to do it. One is the average cost of repair, which he has determined. The other way is to just, at the end of the case, say we're going to have a special master who looks at each of the claims where people have had the problem and determine how much each of those claims are going to be.

So in that regard, it's interesting, I was making myself reacquainted with the Regina Little versus Kia case, which the defendants cite and we cite also, and that was a New Jersey case that was actually tried as a class action. The Judge certified it as a class action. It was tried in front of a jury. There were two methods of damages, the same that we're alleging, the diminution of value and the cost of repair.

In that case the defect was brakes, brake defect. So the case was tried and the jury rejected the diminution of value damages. But it's not really surprising because you're

United States District Court
District of New Jersey

talking about brakes, which everybody -- it's a wear and tear item that people have to replace anyway.  So they found no diminution of damages.

But in our case, we have a component that's central to the engine that breaks and the engine breaks.  So we think that we have a good diminution of value damages case.  The jury did find that the cost of repair was a valid basis for damages for the class.  And the expert, Scott King, opined that it was $750 per brake damage.

The Judge, after the trial, said, you know what, I think that a better way to determine damages is to have a -- appoint a special master and have him look at the claims and determine the claims.  The defendants appealed it, it went to the appellate division, the appellate division said, no, the better way to do it was to have Scott King's $750 analysis, and a reverse.

It went to the Supreme Court, New Jersey Supreme Court, and New Jersey Supreme Court said no, no, no, the trial Judge got it right.  The best way to do this is to have a special master determine the damages.

So from this, what do we take?  We take that a class can be certified and the issues can be tried on a common basis. The jury can determine and understand what a diminution of value damage is.  They can understand what a cost of repair damage is.  Or the case can be tried on liability and we can do

a cost of repair analysis after which the case law says the fact that damages might be individualized does not destroy class certification if common issues are there and can be tried and the case can go forward and we can get a determination and a finalization on whether the defendant is liable or not.  If they are, then we can go to the damages phase.

That's what a lot of the case law in New Jersey, including the Third Circuit says.  We do discuss that further extensively in our brief as well.

So there's -- I guess the point being there's a methodology to determine damages on a class-wide basis here either under the diminution of value or under the cost of repair damages.

I know that Your Honor also had a question about ascertainability.  I'd be glad to answer that.  I know that we put it in our brief and extended our discussion of it, but if Your Honor wants to hear any more on that, I'm glad to discuss it.

THE COURT:  Not yet.  And the reason, quite frankly, is after getting counsel's responses to the ascertainability issue, I really didn't have any questions about it.

MR. GRAIFMAN:  I appreciate that.  Thank you.  And by the way, thank you for having this hearing.  We don't have a lot of oral argument these days.  We do appreciate Her Honor doing that, and the work you put in.

Unless Your Honor has questions, that would be my --

THE COURT:  No.  No questions at this time.  Thank you, Mr. Graifman.

Mr. Walters.

MR. WALTERS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. WALTERS:  Well, I agree with Mr. Graifman on one thing, it's nice to be here in front of Your Honor in person. We don't do that enough these days.

The *Little versus Kia* case is what I want to start with because I was lead counsel on that case for 20 years --

THE COURT:  This is not going to go on for 20 years, promise me that.

MR. WALTERS:  That is part of the reason it shouldn't be certified, but I'll get to that.  It is a bit of a misrepresentation with respect to the trial Court's finding in that case.  Defendants moved to decertify damages once the verdict came in with the idea that diminution had been rejected by the jury.  The only remaining damages finding by the jury was out-of-pocket costs.

Defendants moved, and the trial agreed with the defendants that out-of-pocket costs cannot be a common damages finding because it cannot be presumed that everybody suffered something more than zero.  And that is why there were claims proceedings.

United States District Court
District of New Jersey

The claims proceedings focused on, to a large extent, whether many of the eight thousand class members suffered any damages at all.  It wasn't just a handout numbers and differentiate and recovery.  That was an important distinction and in a moment I'll explain how that applies to an alternative theory that the plaintiffs have in this case.

Your Honor, attorney argument is not evidence.  There is no credible evidence of a design defect in the engines in the Subaru vehicles alleged to be involved in this case.  To establish such a defect, in an individual case, for that matter, but particularly in a far-reaching class action, one needs an expert.  One needs a very competent expert who needs to follow a very disciplined methodology.  That was not done here.

What Mr. Graifman failed to share is they originally hired Dr. Bowers to do that.  But when Dr. Bowers did not test a single vehicle, did not inspect a single vehicle or even look at any of the pistons that are involved in this case, when he stated opinions that were incredibly speculative, when he admitted that people who modified their vehicles are out of the class.  That, of course, prompted defendants to file a *Daubert* motion to preclude him.

Well, there was a tremendous pivot in the case when that happened because for the first time class counsel decided they were going to try to use Mr. Muhammad as their expert in

United States District Court
District of New Jersey

that regard, because they could see the writing on the wall with respect to Dr. Bowers.

Now, Mr. Muhammad had never been identified as an expert. They blew that deadline. They did not produce a report on behalf of Mr. Muhammad. When we deposed Mr. Muhammad, it was as a fact witness to understand his relationship to the named plaintiff, Tresco.

So both of those witnesses in our mind were precluded for similar and different reasons.

THE COURT: So let's talk a little bit about Seven Muhammad, right, because I found the factual -- the dispute between the parties relating to Seven Muhammad interesting.

Defense counsel deposed him. And in response to your questions, you elicit information that is quite, I'll say, interesting with respected to these ringland defects, piston ringland defects. And I say that because, yes, Dr. Bowers may not have done it, but why doesn't Seven Muhammad do it?

And the fact that the testimony is in the record, why can't that go to the jury? So he doesn't have to be an expert. He can give -- remember, an expert is offered under the rules as someone who, without having, we'll say, personal knowledge, has a scientific background where they can give an opinion.

Seven Muhammad is actually giving experiential testimony. And if in his experiential testimony he, through that testimony, can assist the trier of fact in understanding,

18

so why is that precluded?  You preclude an expert because they haven't met skills, method, scientific background, and you want them to avoid net opinion, et cetera.

Seven Muhammad poses a very different proposition for testimony.

MR. WALTERS:  Mr. Muhammad is interesting, I would admit, but improper.  First of all, he worked on Mr. Tresco's vehicle.  He doesn't speak to any of the other vehicles involved in the case.  When class counsel was talking about the vehicles or the vehicle, there are four different types of vehicles involved in this case, Your Honor.  By name, we have WRX and STi.  We have different engines and different iterations of those vehicles which perform very differently.

Mr. Muhammad is only speaking to that.  The notion that Mr. Muhammad's testimony would be used in a manner that it is side-by-side and as a substitute for Mr. Bowers is extremely questionable, particularly since experts matter in terms of their cumulative contribution to the case.

We have a situation which they're both speaking to the same issue and Muhammad is only speaking to his experience with Tresco.  In addition, he makes references that have no substantiation.  He speaks of dealing with hundreds of these vehicles.

Why didn't class counsel go out and put into the record what those hundreds of vehicles would be?  They did not.

United States District Court
District of New Jersey

19

And it's to be questioned very substantially on that basis.

Your Honor, I'd like to very briefly address a couple of the other points that Mr. Graifman made.  But then, I'd like to proceed with a disciplined review of the elements that they have to prove.

The NHTSA complaints, every manufacturer has VOQs existing on a government website where complaints are collected about vehicles.  There's not a single manufacturer that doesn't have them with respect to every vehicle.  That's not telling at all, and it's usurped by the idea that they haven't done the work to show that there is a design defect here.  It goes without saying that a .76 manifestation rate, warranty rate is small when it comes to vehicles actually manifesting a problem.

And the important thing to note about that and it ties into what Mr. Graifman was saying in that email, that's not just piston failures.  Subaru doesn't do it that way.  They can't always trace it.  That's a more general collection of engine failures.  So in that instance you have 99 percent of the vehicle population that has not manifested a concern.

Mr. Graifman said, well, that doesn't capture the people who are recovered.  Fine.  Let's triple it.  Give the benefit of the doubt.  Let's just assume, that's 97 percent of the class that has never experienced a problem.

Your Honor, courts invariability deny class treatment to consumer fraud claims based on alleged automobile defects

United States District Court
District of New Jersey

because individual issues predominate over common ones. And they do that fiercely for two reasons. One is the manifestation issue that I mentioned. Why should it ever matter that we would ever proceed in court or pay attention or look at anything if someone did not experience a problem with a particular feature of the vehicle, here the engine and the pistons. It's no harm, no foul, right? You have to look at that individually one at a time with inspections and understand what was happening.

The second is a consumer fraud claims as Mr. Graifman mentioned, there's allegations of misrepresentations and omissions and the issue of reliance. And in this case, we have to follow the approach that plaintiffs took. They are actually alleging factually, at least the lawyers are because the clients did not confirm this, that the owner's manual and the ancillary information like a maintenance schedule has a certain amount of miles at which you have to get oil changes and things of that nature. They somehow take that to mean that the vehicle is going to last that long when everybody knows that every reasonable consumer can only rely on the Powertrain Warranty as related to coverage, that's five years and 60 thousand miles.

We learned during the case, incredibly, that almost every leading class representative of the four remaining, nobody even looked at the owner's manual. Nobody looked at

United States District Court
District of New Jersey

anything that could have possibly caused them to be misled or anything like that.

THE COURT: So you think that the only way a consumer can be misled is by reading the manual? So what about when you go to the dealership, I'll leave it at dealership right now, whether it be a used car dealership or a manufacturer dealership, you're talking to -- look, I've bought a couple of cars in my life -- you're talking to the sales rep and they make representations to you.

Is it your position that a consumer is not entitled to rely on that representation unless they read the manual?

MR. WALTERS: So we have to look at the evidence of record in this case, Your Honor. We don't have that. That is not in the case.

THE COURT: We do have the marketing material representations about what these vehicles could do. And I'm not, again, I am not making a definitive determination about whether or not ultimately the case can be proven, that's for a later date.

But the question now before the Court, at least with respect to this, is class certification. And when we talk about things, and you've mentioned the 0.76 percent of piston failure issues where plaintiffs point to the defect existing and presale knowledge and materiality.

And so, query, and I caution, as I do most, sometimes

United States District Court
District of New Jersey

my tone is very finite.  It's a job hazard.  So I am truly questioning, if I go to a dealership and they tell me, oh, this is a halo vehicle.  It can do X, Y and Z.  As a consumer, you don't get to rely on that because you haven't read the manual?  I'm trying to --

MR. WALTERS:  That information is only misleading or false if you end up having experience that it's inconsistent with it for the reasons stated.

And, Your Honor, I was going to address this in due course, but I'll jump to a really important part of this case.

THE COURT:  Sure.

MR. WALTERS:  There's no question an overwhelming majority of the folks who bought these vehicles -- over ten years, by the way, they continue to be driven every day -- there's no question that they have not experienced engine problems.

Among the very few who have, the next important element that is critical when you look at each individual case and which cannot be common, what is it that caused the engine problem that they had.  We know from common sense that engine problems can be caused by abuse, they can be caused by modifications, they can be caused by failure to maintain the vehicle, that's a regular thing that happens.  But you know, the record in this case actually confirms that.  And the most striking thing of all is that two-thirds of the original named

United States District Court
District of New Jersey

class representatives in this case voluntarily dismissed themselves from the cases when they initially said they didn't do modifications, but we caught them redhanded during discovery, usually during their depositions, usually because we looked at their social media feeds.

All of them or at least most of them had modified their vehicles for purposes of increasing their performance characteristics, to make them go faster, to increase the horsepower, the sound.

Plaintiffs' own expert, Dr. Bowers, clearly says if any of these owners modified their vehicles, and I quote, they're out.  The plaintiffs themselves have already recognized that it is a palpable consideration when we look at each of these tens of thousands of owners.  We have to ask individually have they, too, modified their engines.  Another one -- by the way, this is the second New York plaintiff that they tried because the first one withdrew.  And the reason he withdrew, was we made a record that the dismissed plaintiff, Mr. Lowell had botched an oil change.  And he readily acknowledged when that was brought up during the case that he could not continue as a plaintiff.

So we know that in addition to whether or not you've experienced any problem at all, would be very few people. Among those very few people, a lot of them were tinkering with their cars or not taking care of them and had nothing to do

with the alleged design defect.  That in and of itself is a basis on which to deny class treatment.  There is not one answer, there is not a common proof to that question of causation in every case.

Now I got a little ahead of myself because I think that is one of the most important issues in the case.  I want to go back, however, because this theory, this legal theory of plaintiffs deserves some examination.  So I'd like to walk through a few of these steps to show Your Honor or share with Your Honor how these elements fall apart and cannot be subject to class treatment.

So the first element is that you own one of the class vehicles, right?  And it's ten years of vehicles.  But it's more specific than that because plaintiff's were really not able to come up with any evidence of knowledge of consumer fraud, except the allegation that in May of 2018 there was a press release issued by Subaru, and that press release provided that we were going to provide new improved pistons for the STi vehicle only.

So plaintiffs' counsel devised that this diminution class that he talked about could only apply to people -- and this is awkward -- who owned their vehicles before the press release came out and somehow allegedly experienced diminution in their vehicle's value when the market went down and they learned that these new pistons were coming out.

25

Now, I'm putting aside the merits where the press release doesn't say the prior pistons were bad. The fact that we improved a part doesn't mean the prior parts were defective. Otherwise, we'd all be plaintiffs in a class action against Apple with our iPhones every day because we get upgrades, right.

So for the reason I really re-up, Judge, is with respect to that diminution class, the -- first because the new class representatives, Tresco and Henshaw, did not own their STi vehicles before May of 2018. They purchased them after. So those two new class representatives, they can't satisfy plaintiffs' own legal damages theory. They're out with respect to that and class treatment has to be denied because they're not common proofs.

The second and perhaps even more significant fact, because again, that press release, I mean they go all in on it as the mean basis for the consumer product, that's 2018, eight years after we started selling the vehicles. The other significant fact is it doesn't cover three quarters of the vehicles in the class because these were WRX vehicles that were not subject to that improvement in the pistons or that press release.

So you've got one named class representative, and you'll forgive me for a second, that's James Moore in Indiana who had a WRX. So he's not in a diminution class, either. And

United States District Court
District of New Jersey

all those states that those plaintiffs seek to represent, Indiana, Tresco is in New York and Henshaw is in Michigan. None of those people in those states consisting in a claim.

THE COURT:  What about Arizona?

MR. WALTERS:  Well, Arizona, Sandavol actually bought an STi beforehand, but I'll get to him in a moment.  He's particularly interesting for a different reason.  Your Honor --

THE COURT:  Let me make sure I capture this correctly.  So your argument relative to this point is that these plaintiffs cannot be good class representatives or illustrate that class certification, one of the elements of class certification is missing?  So is it adequacy or commonality, which --

MR. WALTERS:  That's a great question.  Adequacy is a good start, but the main concerns are standing and adequacy of representation.  But they're also indicative of the idea that people have different types of vehicles, particularly WRX, which can't be included, that just gets cut right out of the class, Judge, on that theory.

So the crafty way that class counsel want to deal with this, this is where this out-of-pocket class comes from. First of all, class counsel did not move for a subclass with out-of-pocket plaintiffs.  That's not part of the motion.  It came up during the briefing.  But right there, they're estopped from doing so.

The other thing is, as we just saw from Mr. Graifman's discussion of Little, out-of-pocket costs are not subject to common proofs. By the way, to have out of pocket costs, you absolutely must have an engine failure and you absolutely have to have an engine failure due to the alleged design defect, and you have to incur actual costs above zero to prevail. That is as inherently individualized as it gets.

So for those reasons, plaintiffs should not be heard to even contend that there is this alternative class. Just give me a moment, Judge. So, we talked at length about the common sense notion that somebody have actually had to experience problems with their engine, right. There lots of people out there that have been driving these cars for ten years, have never had a problem.

This also affects one of the main class representatives, and that's where I'm getting to Mr. Sandavol. And this is particularly interesting, right, because Mr. Sandoval from Arizona has never experienced a problem with his engine as one of the last four named class representatives. That is startling to me. What is particularly startling, wait for it, Mr. Sandoval owns two other class vehicles before this one and had no problems with those, didn't identify them as part of the complaint, doesn't say that he had problems with them. Who in their right mind has two vehicles in the class

United States District Court
District of New Jersey

and they decide, I hate this so much, I'm going to buy another one, and has problems again.  Your Honor, that's not just improper, it's insulting.  And Mr. Sandoval cannot stand for any of those theories, nor can the Arizona class members that he seeks to represent.

I guess it's important that I share Subaru's position on the pending summary judgment and *Daubert* motions, Your Honor.  Certainly cannot be fun to take over that class of motions from another judge.  I'm very cognizant of that.  Our feeling, Your Honor, is that Your Honor can deny class certification without formerly deciding summary judgment and the *Daubert* motions, but the Court cannot grant class certification without deciding at least the *Daubert* motions.

It doesn't make sense to skip summary judgment here.  But the Third Circuit is among a majority of circuits in recognizing that if a plaintiff relies on expert testimony, and here plaintiffs have squarely relied on experts to support class certification, and the defendant mounts facial challenges that are credible, and we have in these motions, that will defeat class certification, if those experts are precluded, they can't support the defect theory and they can't support the damages theory, then the *Daubert* motions would have to be decided if class cert is granted.

Summary judgment doesn't make any sense if Your Honor is going to grant class certification because there's so many

United States District Court
District of New Jersey

substantive causes of action that would be dismissed by the summary judgment motion that your work on class cert would be, if not completely moot, extremely limited.

Now, one other point on that, Your, Honor, the reason I say that Your Honor can deny class certification without formerly deciding those other motions including the *Daubert* is because Your Honor can review that information.  You can review the extensive records set forth with respect to the class certification opposition.  And what other courts have, Your Honor can make certain observations about the poor quality of evidence that have been put forth in support of the plaintiff in support of class certification.  A Court can do that without actually deciding those motions.

And those, I'll give you a couple of citations: *In re Tropicana Orange Juice Marketing and Sales Litigation* 2019 U.S. District Lexis 102566 at 30 to 40, District of New Jersey June 18, 2019.  That's relying on the grand daddy of all class certifications in *In re Hydrogen Peroxide*.  The other decision that found that a Court could question the quality of plaintiffs' proofs and deny class certification without actually deciding *Daubert* was *Kotsur, K-O-T-S-U-R, versus Goodman Global*, 216 U.S. District Lexis.

THE COURT:  Slow down a moment.  Slow down a little to make sure that my court reporter captures the citations.

MR. WALTERS:  Thank you, Your Honor.  The citation

for the Kotsur case is 2016 U.S. District Lexis 111-258 at Note 2 from the Eastern District of Pennsylvania dated August 22, 2016.  By the way, while I'm at it because I very much value the work of the associates who I work with and gathered this information, I'm ready to provide the citations for -- in support of the notion that a Court can look at dismissed named class representatives and the record that has been created on their behalf and finding it relevant in denying class certification.

There's two decisions there on this *Wilson versus Wings Over Happy Valley*, 2020 West Law 869889 from the Middle District of Pennsylvania, February 21st, 2020.  And the other decision is *TR School District of Philadelphia*, 2019 West Law 174-5737 from the Eastern District of Pennsylvania, April 18, 2019.

Another point with respect to Mr. Muhammad, Your Honor, is that ironically Mr. Muhammad makes his living modifying Subaru vehicles.  And in the process has likely resulted in many people being out of the class.  He makes the ridiculous contention in this case when we caught Mr. Tresco modifying his engine that he was modifying the engine to reduce the power, which is not a thing.  One could question that on its face.

Just give me a moment, Your Honor.  I would like to conclude by connecting a couple of dots in the argument that

United States District Court
District of New Jersey

I've already made.  Mr. Graifman started by saying there's this history of Subaru marketing a culture of modifications and how that somehow could allow plaintiffs to modify their vehicles, damage them, cause their engines to fail.  Your Honor, again, plaintiffs' own expert, Dr. Bowers acknowledge that if there were modifications to a vehicle's engine on a class vehicle, they would be out of the class, that's number one.

Number two, I'll just repeat, class counsel and the plaintiffs already acknowledged by dismissing two-thirds of the class reps, most of whom made modifications to their engines, they acknowledged by dismissing them that they know that they cannot state a claim, so that is compelling evidence that that is a big factor one would have to check on individually with respect to each owner, common proofs do not predominate.

Thank you, Your Honor.

THE COURT:  Mr. Graifman.

MR. GRAIFMAN:  Yes, thank you, Judge.  Starting with the issue of Dr. Bower, Dr. Bower is our automotive expert, not our damages expert.  I don't know what Mr. Walters is referring to in his testimony.  He didn't cite it, but he's not our damages expert.  He would be incorrect, obviously, based on the diminution of value damage theory because, again, it's the point of purchase that somebody overpays.  With regard to the two damages classes -- or two damages theories, we're not required to create two subclasses on the class certification

United States District Court
District of New Jersey

motion because we can try both of those just like Mr. Walters did in the *Little v. Kia* case, and it's not that uncommon to try both theories at the same time.

With regard to Mr. Sandoval, it's kind of an interesting situation because he is the epitome of having suffered diminution of damages damages.  He goes to Subaru.  He buys the vehicle from a salesperson who sells him the car for a certain amount of money.  He then wants to sell it after it becomes known through this press release that these vehicles have a piston restructure because of the fact that they had weaker pistons.  He tries to sell it online and the response from people is, I really don't want -- it's in the record, but I don't want a 2018 because the pistons are stronger in the 2019 vehicle.

Then he goes back to the Subaru dealer and says I want to trade it in.  Now, when he bought the vehicle, he had a Subaru guarantee that they would buy it back for a certain price, which was $32,000.  The same salesperson that sold him the vehicle says I can't give you the $32,000 because it has this problem.  So I've got to cut some of that off.  It's right in the record, his trade-in and his purchase.  They gave him $29,000, $3,000 less.  Subaru gives him $3,000 less because of this problem.  So diminution of damages is clearly an issue here and Mr. Sandoval is an example of a class representative who could represent that diminution of value class.

United States District Court
District of New Jersey

They don't say he did any modification.  He did put something called a cat-back on his vehicle, but that just makes the exhaust sound louder, which by the way, Subaru sells, they sell a cat-back.  And their witness testified that that doesn't affect the vehicle.  With regards to --

THE COURT:  So, the argument as to Sandoval that has just been crystalized for me is that he hasn't had a problem with the vehicles.

MR. GRAIFMAN:  But he suffered monetary damages on a diminution of value, that's the theory.

THE COURT:  What is his role in the class?  Who is he representing?

MR. GRAIFMAN:  He's representing purchasers of the vehicle in Arizona, Arizona purchasers and lessees.

THE COURT:  That what?

MR. GRAIFMAN:  Purchased the vehicle for, according to our expert, $2,094 more than they should have.  In this case he actually got $3,000 less when he went to sell it.  And the people he went to sell it to were the same people that sold it to him, Subaru.  So people in Arizona have paid --

THE COURT:  So here's why this all starts to fall apart for class certification -- I'm a straightforward-type -- and why I had the parties supplement with ascertainability. And perhaps rather than make a statement, I'll ask a question. You have four representatives here.  You have two theories of

United States District Court
District of New Jersey

damages with subcategories of damages.  Tell me how each of these class reps satisfy 23(a), and then ascertainability, right, because this is an issue that may preclude class certification.  These are the issues that may preclude because of what I think defendants were very deft at demonstrating was the individualized analysis that has to happen and how these class plaintiffs don't actually reflect members of the class if you go with the design defect theory, and then how it impacted them.

MR. GRAIFMAN:  So, let's take them one at a time with Sandoval.  So he buys a vehicle for a certain amount of money.  Then when this becomes known that there's a problem in May of 2018, he goes to try to sell the vehicle after that and he ends up getting less money.  Our expert has determined that --

THE COURT:  Which expert?  You have two.  You have Bowers and what's the other guy?  Sharp.

MR. GRAIFMAN:  Dr. Sharp is our damages expert who says that one way of determining the damages is by looking at this vehicle before the press release comes out, and its comparative value to other vehicles with regard to this issue.  And he opines that it's 4.7 percent higher than the other vehicle.  In other words, people are paying somewhat of a premium for this vehicle.  After the press release he says that it goes down 2.1 percent, below the comparative vehicle meaning that there's a spread of approximately seven percent difference

between buying the vehicle before the fact becomes admitted by Subaru, if you will, and after the fact is admitted.

So there's a spread of seven percent of people who bought it before suffered, based on diminution of value. Mr. Sandoval is one of those people. And in his case it's not theoretical, it's actually practical because he did actually try to sell it and he did suffer damages. But you don't have to sell it in order to suffer the damages that you overpaid. The case law is very clear on that. Diminution of value is a methodology of class one damages where everybody overpays because defendant made a material omission.

What was the omission? The omission is that there's a defect in the pistons of these vehicles that will cause it to have significant damage if it manifests. But it doesn't have to manifest for diminution of value damage to occur because damages, as I said before, you pay at the time you purchase the vehicle, you overpay.

THE COURT: See, so that statement there, is it your contention that they don't have to actually experience the defect in order to be part of the class?

MR. GRAIFMAN: Yes, and case law is clear on it. If you have a price premium that you've paid for the product, that you've suffered your damages at the point of sale. And as I think we cited before, the Eidelman case in the Second Circuit. There are Third Circuit cases as well that we cited in our

brief for the proposition that diminution of damages occurs where there's a material omission.  And the person buys the product and wouldn't have had they known or wouldn't have done it at that price had they known of the issue.  And people would not have bought this vehicle at that price if they knew that there was a weak ringlands piston that would be affected if the horsepower spiked because of the aggressive ECU engine tuning and the general horsepower that these vehicles have.

THE COURT:  What about the fact that 0.76 percent of the vehicles had the piston failure?  What's the Court to do with that and how does it bolster or suggest that class certification is appropriate?  And this goes to commonality.

So on top of that ascertainability, I think the focus, what I've distilled out of the 23(a) factors is the commonality perspective given the slight experience that consumers have had with this piston failure.

What do we do with that?

MR. GRAIFMAN:  First of all, we contest that it's a slight failure because as testified to by their own people, yes, we have warranty information, but most people will go to somebody else to have it repaired after the warranty.  So these are after warranty failures that they don't have records of.  I think they've admitted that in their testimony of their 30(b)(6) witness, that's first of all.

Second of all, the manifestation failure is at odds

United States District Court
District of New Jersey

with the experiential testimony, as Your Honor pointed out, of Seven Muhammad who says he sees hundreds of these every year, and that's a problem.

Third of all, the fact that the rate is 0.76 doesn't necessarily make it a small rate as effective with regards to what is considered material from a consumer or an automotive standpoint. And car experts, like Mr. Bowers, for example testified the failure rate of piston, piston range in Subaru class engines shown in the table below is above any acceptable automotive failure rate. A rate failure of one in one hundred, the uniformed process used to validate the piston and piston ringlands was inadequate. So you don't need a very large percentage in automotive. There's a case we cite to and I put as an exhibit in our reply papers to Your Honor called Neuer(ph.) where the Judge there tried a class automotive vehicle defect case. And afterwards, the defendant made the same argument, well, we had a 0.3 percent manifestation rate. And the judge said, well, that's not dispositive because that doesn't tell me what vehicles were failing after the warranty. You're just giving me the warranty rate, and that's not dispositive of the case. We attached that. I would invite Your Honor to read it. It's one of the exhibits in the reply attached.

So the failure rate is kind of a red herring and it's kind of a false argument in a case like this. Of course, the

final argument is in a diminution of value or price premium payment, it doesn't matter what the failure rate is because the damage is done when you buy the vehicle for more than you would have or should have because of the misleading, lying statement from the company that is omitting the fact that, hey, you might have this problem and it's going to cost you $8,000 to fix if you do.

These are not small problems.  It's not like your brakes go bad and you have to repair them for a couple hundred dollars.  This is an engine replacement problem.  So it is a material problem.

With regard to ascertainability, I know Your Honor raised that just now.  So in the automotive world, as I'm sure Your Honor is familiar with, there's lots of documentation demonstrating how much somebody paid for the vehicle, where they bought it, when they bought it, if they had a problem there's usually a record from either the dealer or an independent shop.  There's lots of ways to ascertain who is in the class.  We do this all the time in settlements, and it's the same theory.  We put in Mr. Azari's declaration explaining it.  Basically there's entities that will go and pull all the registration records, both current and historical.  And those records will demonstrate who purchased the vehicle in that state.  If those don't do it, everybody has purchase contract for a vehicle.  I mean, this is the largest purchase you're

United States District Court
District of New Jersey

going to make other than your home.  So they can demonstrate where they bought the vehicle and when they bought the vehicle.

The record of the injury is usually pretty easy to get because people usually keep it.  They can go to the dealer for it.  The independent shop usually keeps records for a period of time.  So the ascertainability issue shouldn't be a problem in this case.  If somebody buys it from one of the out-of-state entities, such as Carvana, which I think Your Honor mentioned.  There's actually a couple of cases in New Jersey that were involving Carvana, and the Courts in New Jersey have used New Jersey law when the purchaser was in New Jersey regardless of where Carvana may have shipped the car from.  So it's the state in which you purchase the car.  Plus you presumably pay your vehicle sales tax within the state that you're purchasing it as well.  So ascertainability would not be an issue in the case, particularly with the diminution of value damages.

With regard to Tresco, we submit he, too, has suffered diminution of damages because in his case he actually went to a Subaru dealer, and Mr. Tresco says in his deposition he wasn't actually looking for a WRX STi, but the dealer calls him up says I've got one, this is a really good car.  He said to the dealer, I've heard that there's a problem.  The dealer said, no, there's no problem.  This is a really reliable car. You're going to love the car.  I mean, it's pretty clear in his

United States District Court
District of New Jersey

testimony that he also is subjected and a victim of a material omission because had the dealer told him about the defect at the time, he wouldn't have bought his vehicle and he so states in his deposition and his declaration.  So he also suffered a diminution of value for his vehicle because of the material omission.

So we would contend that he is an adequate representative for that diminution of value damage class.  And, of course, he is also cost-of-repair adequate because he had the vehicle injury and he did have to pay for it, a substantial amount in his case.

With regard to Seven Muhammad, they make the ridiculous statement that you can't tune down a vehicle.  Of course you can do that.  He's an expert doing that, that's what he did.  He testified that's what he did in Mr. Tresco's vehicle and they didn't ask him for any proof of that.  They had a chance to --

THE COURT:  This Seven Muhammad issue, let's just get past that because I have to deal with him and the experts in a different way, and I'm prepared to do that.

MR. GRAIFMAN:  So with regard to their statement that the engines are different and that the manifestation of the injury is different, that's not the testimony of their own Japanese expert.  He testified, Question:  "Is the chemical composition for the piston material for the RA engine the same

United States District Court
District of New Jersey

as the chemical composition for the 2017 EJ 257?"  Answer, "The materials were the same."  Next.  Witness, "Because of the piston land braking occurs when the large combustion pressure is applied onto the piston rings."  Question, "Are there any other causes of ringland failures that you're aware of?"  Answer, "No there aren't."

Next, Page 57.  Question, "Do you know the casting method used by Hitachi to form the EJ255 and EJ257 pistons?"  Answer, "Yes."  Question, "Is it sintered material?"  Then there's some discussion.  The witness says, "So when we use the word 'sintered material', that will be sintered and bound material?"  "Yes, sintered metal is a familiar term to me.  So even when I don't speak much English, I understand the term because it's in the powder form and it's pressed to form and then it is burned or sintered and made into a -- into a, make hard."

So they're all sintered.  All of these are the same.  The method of injury is the same.  Yes, engines do fail for many reasons, but we're talking about the piston ringlands, a specific part with a specific problem, and that's what this case is about.  If it was just about engine failures, then the defendant would be correct.  There are many reasons engines fail, but we're not talking about that.  We're talking about one part that is the same in all of these vehicles.  So that argument should not pass muster.

United States District Court
District of New Jersey

With regard to Bower, Mr. Walters is making some fictional story up that we somehow positioned away from Mr. Bowers and we thought -- no, no.  We just identified Mr. Muhammad as a fact witness.  They're the ones who decided to go out and started asking his opinion.  They opened the door to that.  I know Your Honor doesn't want to talk about Mr. Muhammad anymore, so I'll just leave it at that.  But no, we didn't position away from Mr. Bowers.  Mr. Bowers testified very clearly that there's an issue here with the composition of the piston, an issue with the design of the piston, an issue with the fact that there's no oil sprayers which would cool them and, therefore, they would get overheated and break the ringlands.

In sum, I think we have a common defect.  We can demonstrate that there's common evidence that there was an omission and that they never told people, that had people learned of it, it would have been material, which is a jury question based on a reasonable consumer standard in all these states.  And that there's a methodology to prove class-wide damages.  But again, I would stress the class-wise damage proof is not dispositive of whether a class should be certified on the liability issues.  And we do brief that, so I'll leave it at that.

Thank you, Your Honor, again for the time and if you have any questions, I'll be glad to answer.

United States District Court
District of New Jersey

THE COURT: Mr. Walters.

MR. WALTERS: Your Honor, very briefly a couple of additions to the record. First of all, with respect to Mr. Sandoval, the guaranteed purchase program that Mr. Sandavol participated in does not apply to modified vehicles. Mr. Sandavol had a modified aftermarket exhaust. He was also over the mileage for the program, that's why he was dinged at 3,000 miles. It had nothing to do with the other issue.

Briefly, Your Honor, I did want to speak to the manifestation issue which we've briefed, I'd like to highlight. So at the start of the class certification process plaintiffs relied almost exclusively on the Speerly decision at the District Court level, and in the midst of awaiting a decision, Speerly was overturned by the Sixth Circuit. And one of the primary basis on which it was overturned to find the class certification was inappropriate to that case in which automotive design defects were alleged to be common was that determining which vehicle owners actually experienced either the shutter or the hard shift amended member-by-member inquiry. So that's one of the most recent pronouncements on that. Of course, the Court also realized that individualized reliance determinations were relevant.

I say this was an anomaly because there are numerous cases, the majority, in fact, that we cited in our class certification opposition brief, I just want to make brief

United States District Court
District of New Jersey

mention of them.  I won't provide the citations because they're in the brief, but *Marcus versus BMW* from the Third Circuit, 2012, alleging defects involving motor vehicles often involve complicated issues of individual causation that predominate over common questions regarding the existence of a defect.

*Estate of Pilgrim versus GM*, at base a fatal problem for plaintiffs is that they are alleging the existence of multiple defects which may or may not be uniformly present in all class vehicles.  Again, they're focusing on actual presence.

*Payne versus Fuji Film* rejecting certification based on a four percent total failure rate because individual issues of damages predominate over common issues because most members of the class had not experienced a defect.

*Johnannessohn versus Polaris* in the Eighth Circuit in '21, certification denied where evidence showed many products had not manifested the alleged defect.  That is a common thing and among the many other issues that we have identified as obstacles to class treatment, common issues cannot predominate, this would require thousands and thousands of mini trials before the jury.  The time consumption alone would be many, many years beyond what an individual might experience if they were to pursue their individual claims on their own.

That's all I have, Your Honor.

THE COURT:  Thank you.

United States District Court
District of New Jersey

MR. GRAIFMAN:  Can I just respond?

THE COURT:  Sure.

MR. GRAIFMAN:  So with regard to *Marcus v. BMW*, that's an interesting case that demonstrates the difference between that type of case and our type of case.  So Marcus was dealing with run flat tires.  And run flat tires are wear and tear items, and they are replaced commonly.  Sometimes they're replaced at the BMW dealers, sometimes they're replaced elsewhere.  And the Court found that the evidence demonstrated that there was no way to know who had a run flat tire and who didn't have a run flat tire because people just go off and get run flat tires from other than the dealers.  And the dealers testified in that case that they don't keep track of whether the person's vehicle has run flat tires or not, they didn't have records.  I don't know why that was the case, but that was the testimony in Marcus.

So Marcus dealt with tires that are not an engine. It's not part of the vehicle.  It's something you add onto the vehicle as tires.  You can replace them at Mavis.  You can replace them anywhere.

So what we're dealing with here is an engine component that's central to the engine.  And it's clear evidence when somebody has a ringlands problem that they had that problem and that they had to fix it and what it cost them as opposed to just getting new tires.

United States District Court
District of New Jersey

With regards to Speerly, in Speerly, I don't remember if it was 21 or 27 state classes, but there were more than 20 classes.  And what the Court and panel in Speerly found was that it was not manageable and, therefore, couldn't be certified.  There were just too many states with too many different elements.  Here we're just dealing with essentially three or four states, so that's not really an issue.  Speerly reasoning for overturning doesn't affect this case.

With Pilgrim, there were multiple defects alleged, so that was the issue.  Here as I think said earlier in my presentation, that we're dealing with just the ringlands defect.  This is not like an engine failure, per se.  It's a ringlands defect engine.

In *Payne v. Fuji*, percentage, there we're dealing with defective cameras, which is a different industry.  A four percent failure rate for an automotive vehicle would be a recall mandated by the National Highway Traffic Association.  And a camera of four percent is probably not that high.

So I just wanted to point those out.

THE COURT:  All right.  So as indicated, the Court has been going through these submissions and the motion for class certification, briefly reviewed the motion for summary judgment and actually took some time reviewing the Motions in Limine with respect to the expert reports of Bowers, Sharp and then the testimony of Seven Muhammad.

United States District Court
District of New Jersey

After having reviewed the motion for class certification, the Court requested that the parties provide supplemental briefing with respect to ascertainability and the threshold requirement there.

So let me start here with the legal standard pursuant to Rule 23(a)(2) and just go through, as it were, the requirements under Rule 23(a). So 23(a)(1), so let me start -- backup a little bit. Under Rule 23(a), a plaintiff must establish, one, numerosity; two, commonality; three, typicality; and four, adequacy of representation. In addition, because plaintiffs seeks certification under Rule 23(b)(3), they must show that common questions predominate over individual ones and that class action is superior to other methods. The Court must conduct a rigorous analysis to determine whether these prerequisites are met.

As for numerosity, in fact, defendants don't even contest numerosity from what I can see, so I move straight to commonality. Plaintiffs' position is common questions include whether the defect exists in all class vehicles. Subaru's presale knowledge, materiality to a reasonable consumer and Subaru's duty to disclose. Plaintiffs contend these questions are capable of resolution with common proof, including expert testimony and internal Subaru documents.

Defendants' position is that only 0.76 percent of class vehicles experienced piston issues, many caused by

individualized factors such as aftermarket modifications, abusive driving, poor maintenance or fuel quality.  They also emphasized the differences in the various models, EJ255, EJ257, FA20 engine designs requiring separate analysis.

Because plaintiffs have identified at least one question central to each cause of action that is capable of class-wide resolution, to note, whether the pistons in each engine type share materially similar design characteristics that render them prone to premature ringland failure under normal use.

Plaintiffs' expert opines that the engines share critical common attributes causing the same defect.  While individualized causation will be relevant to damages for certain members, the existence and concealment of the defect are common questions, so that commonality is satisfied.

As for typicality, plaintiffs' position is all named plaintiffs purchased class vehicles with the same defect and suffered economic injury in the form of diminution in value or cost of repair.

Defendants' position is that certain plaintiffs purchased after Subaru's May 2018 press release about the piston redesign while others modified or raced their vehicles creating unique defenses.

Typicality does not require identical circumstances. It requires that the claims arise from the same course of

United States District Court
District of New Jersey

conduct and are based on the same legal theories.  Here all named plaintiffs allege injury from the same omission.  The possibility of unique defenses such as post-announcement purchases or modifications does not defeat typicality, given the overarching uniform omission claim.  Therefore, typicality is satisfied.

Adequacy, plaintiffs' interest are aligned with the subclass and counsel is experienced in class litigation, defendants' argument that unique defenses undermine adequacy is unpersuasive at this stage.  No conflict exists that would prevent vigorous representation.  Adequacy is satisfied.

Predominance.  Plaintiffs' position is that liability issues -- existence of defect, knowledge, materiality, reliance, presumed on omission cases and duty to disclose can be proven with common evidence.  Damages can be calculated on a class-wide basis using a price premium model or a cost of repair model.

Defendants' position is that individualized in-court inquiries predominate including whether the defect manifested, cause of any failure and the impact of modifications, maintenance or misuse.  Defendants contend plaintiffs' damages models are unreliable under *Comcast versus Behrend* 1569 U.S. 27 (2013).

The central liability issues here are susceptible to common proof.  However, proof of manifestation and causation

may vary significantly for certain claims, particularly negligent misrepresentation, which under some state laws may require individual reliance.

Given plaintiffs' omission-base theories and the statutory frameworks invoked, the Court finds that common questions predominate for the statutory consumer protection claims under New York, Arizona and Indiana law.

For negligent misrepresentation, predominance is a closer question.  In Michigan, individualized reliance could not predominate.  So the Court will certify the statutory claim for all four states and the negligent misrepresentation claim for New York, Arizona, and Indiana only.

Superiority, the class action device is superior given the relatively modest individual damages, the uniformed alleged omission and the inefficiency of multiple individual suits.

Defendants manageability arguments premised on *Speerly versus GM, LLC* are inapposite.  Here there are only four states and two related models.

Having requested that the parties submit additional supplemental briefing on ascertainability, the Court addresses only this threshold requirement next, and that dispute centers on whether members of the proposed four statewide classes, New York, Arizona, Indiana and Michigan, can be identified in an administratively feasible and reliable manner without resort to

United States District Court
District of New Jersey

individualized mini trials.  In the Third Circuit, ascertainability is an independent requirement for Rule 23 (b)(3) classes, see *Marcus versus BMW* 687 F.3d 583.  Plaintiffs must show by a preponderance of the evidence that the class is defined with reference to objective criteria and there is reliable and an administratively feasible mechanism for determining whether putative members fall within the class definition, *Hayes versus Walmart* 725 F.3d 349.  A plaintiff cannot satisfy this requirement by relying solely on say-so affidavits, see *Carrera v. Bayer Corp* 727 F.3d 300; however, ascertainability is a narrow inquiry that should not be conflated with other Rule 23 requirements, *Byrd versus Aaron's, Incorporated* 784 F.3d 154.

Plaintiffs' position with respect to ascertainability is that motor vehicles are large ticket items whose ownership is well-documented.  They proposed to identify current and former owner, lesses of class vehicles using VIN numbers, linked data from state's DMVs, insurance carriers, manufacturer records, and commercial databases.  The request for proof of purchase, sales contracts, bill of sale, financing agreement from identified owners to confirm class eligibility including purchase date, location and seller date.  Plaintiffs emphasized that similar VIN-based methods were approved and implemented in the Takata Airbag MDL, and in Subaru's own Powell, P-O-W-E-L-L, settlement, and that this distinguishes Marcus and Carrera as

involving inexpensive, fungible products without VINs, registration or insurance cards.

Defendants respond that the plaintiffs' method fails the Third Circuit's heightened ascertainability standard, indicating that while VIN and DMV records identify owners, they do not reveal whether the vehicle was purchased from an authorized Subaru dealer, private seller or non-Subaru dealer.

Plaintiffs' reliance on owner-supplied affidavits and documents to establish seller type is, in defendants' view, precisely the say-so method rejected in Marcus, Carrera and Hayes.

The proposed class definitions limited by VIN ranges, model years 2009 to 2018, WRX and STi state of purchase and statutory cause of action are objectively ascertainable. This prong is undisputed. The dispute lies in whether plaintiffs' two-step process meets the requirements for a reliable and administratively feasible mechanism under Marcus, Carrera, Byrd and Hayes. So the Court first address availability of records.

Unlike Marcus' run flat tires or Carrera's OTC supplements, over-the-counter supplements, the product here is a registered motor vehicle with a unique VIN, state DMV title and registration records, mandatory insurance documentation and manufacturer warranty and sales records. These data sources can generate an initial list of owners/lessees within the class definition parameters. This step is both reliable and

administratively feasible satisfying Byrd's narrow inquiry for the first phase.

Second, determining seller type. This is a more difficult question necessary under plaintiffs' class definition can be accomplished without impermissible individualized inquiries. Then DMV, insurance and manufacturer records generally do not identify seller type. Plaintiffs' propose to solicit proof of purchase from owners to confirm that element. If the submitted documentation is a standard dealer bill of sale or finance agreement, verification is straightforward. But for private transactions or older vehicles, documentation may vary in form or completeness and may require follow-up to resolve ambiguities.

The Third Circuit has rejected methods that depend solely on self-identification without verification, that's the premise for Marcus and Carrera and has cautioned against methods that would devolve into mini trials, see Hayes.

However, it has not barred owner submissions altogether provided they are objectively verifiable by reliable records.

On this record plaintiffs have shown that the vast majority of vehicle purchasers retain documentary proof due to title transfer, registration and insurance requirements and that such proof typically identifies the seller.

Defendants have not demonstrated that resolving

United States District Court
District of New Jersey

seller type would in most cases require credibility determinations or contested fact finding rather than ministerial document review.  The possibility that some claims will lack adequate documentation does not defeat ascertainability.  Such claims can be rejected without burdening the process, that would be consistent with Byrd.

Given the nature of the product, the available databases and the expected uniformity of purchase documentation, the Court finds the proposed process distinguishable from the unverified affidavit schemes rejected in Marcus, Carrera and Hayes.  At the core of the Court's determination is the fact that this is a vehicle.  This is a motor vehicle purchase and the purported design defect is the engine, not the tires, not the windshield, not these other things -- windshield is probably not a good example -- the door handles, things that are habitually used.  We're talking about an engine and the tracking of a vehicle.  The only vehicles that are not tracked in this Court's estimation are ones that are illegally or unlawfully exchanged.  Vehicles require, have a VIN number.  This Court is very familiar that cars' VIN numbers are obliterated illegally, those folks aren't coming forward.  Every car has to be insured.  Cars have to be registered with DMV.  These issues of ascertainability are very distinct from Marcus, Carrera and Hayes because of the nature of the product, a vehicle engine.

United States District Court
District of New Jersey

So the Court holds that plaintiffs have met their burden and demonstrate ascertainability, the class is defined with objective criteria. And plaintiff's have proposed a reliable, administratively feasible method to identify members using VIN, DMV, insurance, manufacturer data supplemented by verifiable proof of purchase.

While some individual submissions may be excluded for lack of adequate documentation, this does not create the type of individualized mini trials that the Third Circuit's ascertainability precedence prohibits.

That concludes the Court's determination. Class certification will be granted for those reasons. I do not intend, obviously, on issuing a separate written opinion. I will have an order commensurate with what has been decided here. And the transcript, of course, will be available to the parties.

And note that I will review this transcript and provide the citations to the cases. I know I just kind of glossed over them, primarily because you all know these cases better than I do, but I will make sure that I indicate in the transcript the appropriate citations for the cases.

MR. WALTERS: Your Honor, will you issue the order alongside the opinion when that comes out together?

THE COURT: So I'll probably do the order -- actually the order will probably come out either today or probably

Monday.  The transcript will be available.  I'm not issuing a separate opinion.

MR. WALTERS:  Okay.  Thank you, Judge.

THE COURT:  Let's talk about these other issues because I have to tell you, Mr. Walters makes some excellent points, which are not lost on the Court.  However, based on the papers and the cases as I reviewed, I thought class certification, at the end of the day, is the correct result here.  To be clear, I think plaintiffs do have some obstacles here that may, in fact, rear their heads as we proceed.

Two other issues, and Mr. Walters addressed these, the Motions in Limine regarding the experts and the motion for summary judgment.  So clearly the motion for summary judgment, what do you want to do with that, Mr. Walters?

MR. WALTERS:  Your Honor, I think we need to huddle on our team about the prospects of the 23(f) in light of the *Daubert* motions.  And I do know we can take a position as to those.

THE COURT:  All right, so that is exactly what I thought needs to happen now.  Again, why I had you all come in so I could hear a little more directly from counsel.  Sometimes when you hear things, they land a little differently than the written page.  And I do think this is an issue.  So hopefully I have distilled to what I will be looking for with respect to 23(f) and the motion for summary judgment and how that goes

United States District Court
District of New Jersey

forward at this juncture.

So that will -- the motion for summary judgment and the Motions in Limine, I think they're administratively terminated already?

MR. GRAIFMAN:  I believe so, yes.

THE COURT:  And you all know administratively termination just means it's not actively being considered by the Court, but as you also should have recognized, based on part of the comments that I made with respect to Bowers, Sharp and Seven Muhammad, I have reviewed these motions, and in some respects relied on what I read in the expert testimony as to one of the prongs for 23(a), which I must, so it's going forward.  But now given the fact that the class cert has been granted, how you move from here is up to you all.  So I'm not reinstating.  I leave it to Counsel how you want to address 23(f) and motions for summary judgment.  I think you need to recast it, motion for summary judgment.  But I will leave it to you to, as you say, huddle with your team.  Tell me what you want to do.

MR. WALTERS:  Thank you, Your Honor.

THE COURT:  You're welcome.

Anything further for the Court this afternoon?

MR. GRAIFMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  You all have a good afternoon and good weekend and happy Thanksgiving.

United States District Court
District of New Jersey

(Proceedings concluded at 12:48 p.m.)

- - - - - - - - - - - - - - - - - - - - - - -
**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
- - - - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


/S/ Sherri Benson, Official Court Reporter
11/25/2025
*Court Reporter/Transcriber*

United States District Court
District of New Jersey